IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GENERAL ELECTRIC COMPANY,

        Plaintiff,

v.

LPP COMBUSTION, LLC,

        Defendant.

Civil Action No. 22-720-GBW

---

David E. Moore, Bindu A. Palapura, Andrew L. Brown, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Mark Reiter, Robert A Vincent, Betty X. Yang, Philip J. Spear, GIBSON, DUNN & CRUTCHER LLP, Dallas, Texas; Timothy P. Best, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, California.

    *Counsel for Plaintiff*

Richard Charles Weinblatt, STAMOULIS & WEINBLATT LLC, Wilmington, Delaware; Cortney S. Alexander, KENT & RISLEY LLC, Alpharetta, Georgia.

    *Counsel for Defendant*

**MEMORANDUM OPINION**

March 28, 2025
Wilmington, Delaware

GREGORY B. WILLIAMS
UNITED STATES DISTRICT JUDGE

Pending before the Court is Plaintiff General Electric Company's ("GE") Motion for Judgment on the Pleadings (hereinafter, the "Motion") challenging the validity of claims 1, 2, 4, 8–10, 12–14, 16, 19, and 20 of U.S. Patent No. 7,435,080 ("the '080 Patent") and claims 1–6, 8, 9, 11, 12, 16, 17 and 19 of U.S. Patent No. 7,934,924 ("the '924 Patent") under 35 U.S.C. § 101. D.I. 80. Defendant LPP Combustion, LLC ("LLP") opposes GE's Motion. D.I. 186. The issue has been fully briefed (D.I. 81; D.I. 91; D.I. 93). Having reviewed the Motion and all related briefing, the Court finds that the claims of the '080 Patent and the '924 Patent are not directed to patent-eligible subject matter. Accordingly, the Motion is granted.

## I.   BACKGROUND

The '080 and '924 Patents are related (the '924 is a divisional of the '080) and share the same specification (the "Specification"). *See* D.I. 1, at Ex. E ('080 Patent), Ex. D ('924 Patent). The '080 Patent acts as "representative" of the two patents. D.I. 81 at 2 (quoting D.I. 51 (Joint Claim Construction Brief) at 3–5). These patents "focus[] on controlling the performance of a combustion device (such as a gas turbine) based on sensed information relating to the combustion performance." *Id.* (citing '080 Patent, 1:46–57). They "teach[] adding a fuel additive to change combustion performance based on information sensed about the fuel." *Id.* (citing '080 Patent, 1:46–57).

LPP currently asserts 25 of the 42 total claims (the "Claims") from the '080 and '924 Patents: claims 1, 2, 4, 8–10, 12–14, 16, 19, and 20 of the '080 Patent and claims 1–6, 8, 9, 11, 12, 16, 17 and 19 of the '924 Patent (collectively, "the Claims"). The Claims differ little. As discussed in more detail below, the Claims of both patents distill down to the same three steps: (1) sensing a

2

fuel or combustion characteristic; (2) comparing the sensed characteristic to an acceptable range and outputting the result; and (3) adding an additive (either an enhancer or retardant) to the fuel feed depending on whether the characteristic is above or below the range, in an amount dependent on the fuel flow rate. These three steps match the same steps used by a home thermostat or a person adjusting bath-water temperature: (i) sense, (ii) compare, and (iii) adjust. For the purposes of this motion, claim 1 of each patent is representative of all Claims in that patent. D.I. 81 at 5.

### a. The '080 Patent Claims

The '080 Patent includes 22 claims. Claim 1 of the '080 Patent is representative:

> A fuel feed adjustment system for use with a combustion device having a fuel feed, the system comprising:
>
> > a sensor for sensing a sensed fuel characteristic of fuel being fed to the combustion device, the sensed fuel characteristic being indicative of a fuel combustion property;
> >
> > a processor for comparing the sensed fuel characteristic to an acceptable range for the fuel characteristic, the acceptable range corresponding to a predetermined range for the fuel combustion property, and for outputting an output when the sensed fuel characteristic is outside the acceptable range; and
> >
> > an additive feed for feeding an additive to the fuel feed, the additive feed being triggered by the output, wherein the additive includes a combustion enhancer or a combustion retardant depending on whether the sensed fuel characteristic is above or below the acceptable range, and wherein an amount of additive is dependent on a sensed fuel flow rate.

'080 Patent at claim 1. The claim does not claim the result of bringing the fuel characteristic within an acceptable range. Instead, the claim requires adding an "additive" when the processor determines the fuel outside the predetermined range. '080 Patent at claim 1

The following asserted '080 Patent claims are dependent on claim 1. Dependent claim 2 identifies several conventional sensing techniques. *Id.* at claim 2. Dependent claim 4 requires that the "characteristic" is "indicative of a fuel composition." *Id.* at claim 4. Dependent claim 8

3

requires that the sensor senses "indices of fuel performance," and dependent claim 9 further requires specific indices. *Id.* at claims 8, 9. Dependent claim 10 merely requires the combustion device be a "turbine." *Id.* at claim 10. Dependent claim 12 claim requires the fuel feed be natural gas. *Id.* at claim 12. Dependent claims 13 and 14 require that the additive is "provided from an additive feed source" and "controlled via a feed control mechanism." *Id.* at claims 13, 14. Dependent claim 16 specifies that the processor can be "an analog controller or a digital computer or both." *Id.* at claim 16.

The additional asserted independent claims—19 and 20—are directed to the same subject matter as claim 1: claim 20 merely converts the "fuel feed adjustment system" of claim 1 into a "method of adjusting a fuel feed," whereas claim 19 merely restates claim 1 using non-substantive different wording. *Id.* at claims 19, 20; *see* D.I. 81 at 6.

### b. The '924 Patent Claims

The '924 Patent includes 20 claims. Claim 1 of the '924 Patent limits the fuel feed to a "gaseous" fuel feed, and requires sensing a "combustion" characteristic instead of a "fuel" characteristic, but is otherwise virtually identical to claim 1 of the '080 Patent:

> A fuel feed adjustment system for use with a combustion device having a gaseous fuel feed, the system comprising:
>
> > a sensor for sensing a combustion characteristic for the combustion device;
> >
> > a processor for comparing the sensed combustion characteristic to an acceptable range and for outputting an output that indicates when the sensed combustion characteristic is outside the acceptable range; and
> >
> > an additive feed for feeding an additive to the gaseous fuel feed, the additive feed being triggered by the output, wherein additive includes a combustion enhancer or a combustion retardant depending on whether the sensed combustion characteristic is above or below the acceptable range, and wherein an amount of additive is dependent on a sensed fuel flow rate.

4

'924 Patent at claim 1. As with the '080 Patent, the other asserted independent claim, claim 16 is essentially the method claim analogue of claim 1, further requiring sensing a fuel flow rate as well as a combustion characteristic. D.I. 81 at 7.

The following asserted '924 Patent claims are dependent on claim 1: dependent claims 2 and 17 limit the sensed combustion characteristic to a flame characteristic ('924 Patent at claims 2, 17), and claim 3 further limits that characteristic to a group of flame characteristics (e.g., flame color). *Id.* at claim 3. Claims 4 and 8—like claim 2 of the '080 Patent—provide lists of known types of sensors. *Id.* at claims 4, 8. Claim 5 limits the sensed combustion characteristic to an indicator of combustion stability or performance, and claim 6, which depends on claim 5, further requires that combustion stability be based on flow or pressure fluctuations. *Id.* at claims 5,6. Dependent claims 9, 11, and 12 of the '924 Patent repeat claim 10 ("turbine"), claim 12 ("natural gas" fuel), and claim 14 ("feed control mechanism") of the '080 Patent. *Id.* at claims 9, 11, 12.

c. **Figure 4**

As an illustration, the parties highlight Figure 4. "Figure 4 below illustrates the turbine improvement focus of the '080 [and '924 Patent's] invention." D.I. 81 at 2.



Figure 4 includes a "fuel line 305; a combustor 325 to burn the fuel; a sensing system 310; a controller 315 to . . . determine how much fuel additive(s) to add or otherwise select to vary the additive(s) delivered to the fuel; and an additive system 320 to store and control the flow of the additive(s) into the fuel line." *Id.* at 5 (quoting '080 Patent, 9:9–15). The sensor can sense either characteristics of the fuel or characteristics of combustor performance. *Id.* (citing '080 Patent, 1:61–64, 2:28–32). "Depending on the sensed result using either method, the '080 system injects an additive into the fuel stream, which comprises either a combustion enhancer (e.g., if the sensors detect combustion performance is low) or a combustion retardant (e.g., if the sensors detect combustion performance is too high)." *Id.* (citing '080 Patent at 2:10–21, 2:47–59). The '924 Patent differs from the '080 Patent only in requiring a "gaseous" fuel feed, and sensing combustion (rather than fuel) characteristics. All of the system's components are based on conventional technology. *Id.*

**Combustion Device**: "The combustion device usable with the present invention may comprise any a number of known or developed combustor or burner devices used to combust fuel and that may be used for any number of purposes that such devices are typically used." '080 Patent at 3:24–28.

**Fuel Feed**: There are no details in the specification concerning what equipment may be used for the fuel feed. Instead, the specification only provides examples of well-known fuel feed types (natural gas, process gas, and syngas). *Id.* at 7:36–37. The parties' agreed that the terms "fuel feed" ('080 Patent) and "gaseous fuel feed" ('924 Patent) should be construed as carrying their plain and ordinary meaning, i.e., a "feed that carries fuel both before and after the additive is inserted." D.I. 67 at 3.

6

*Sensors*: "A wide number of sensors are usable with the present invention," and "can directly or indirectly measure fuel composition or combustion properties, or both." '080 Patent at 3:34–4:5; *see also id.* at 3:57–58 ("[T]he sensors can include known types and methods designed to measure flow rate for the fuel."). The patents provide non-exclusive lists of (1) known characteristics that a sensor may be capable of sensing, and (2) known methods that could be used to sense and measure various characteristics. *Id.* at 3:37–4:5.

*Processor/Controller*: The claimed processor must simply be capable of "perform[ing] calculations" and "generating control signals" to direct the use of additives. *Id.* at 4:7–59. It can be an "analog device," a "digital device," or a "computer." *Id.* It can be a "stand-alone device" or part of "a network, such as the Internet." *Id.* It can be "implemented using hardware, software, or a combination thereof." *Id.* Dependent claim 16 of the '080 Patent states that the processor "comprises an analog controller or a digital computer or both." *Id.*, cl. 16.

*Additive Feed and Additives*: The patents include no particular limitations for the additive feed, other than that it must have the "capability to add the additives to the fuel." It may have a reservoir for additives (or not), may use materials "on the fly" from the air (or not), and may contain metering valves (or not). *Id.* at 6:10–44. The specification gives a list of ten known additives but makes clear that the list is non-exclusive. *Id.* The parties' agreed that "combustion enhancer" should be construed by its plain and ordinary meaning, i.e., that it "includes compounds that when added to a fuel mixture enhance[] combustion, such as by increasing flame temperature, flame speed or volumetric heat release rate." The parties did not propose or present argument on the meaning of "combustion retardant."

7

## II. LEGAL STANDARDS

### a. Judgment on the Pleadings

A party may move for judgment on the pleadings, "[a]fter the pleadings are closed[,] but early enough not to delay trial." Fed. R. Civ. P. 12(c). The Federal Circuit reviews a district court's judgment under FRCP 12(c) under the law of the regional circuit. *Biogen Intl. GmbH v. Banner Life Scis. LLC*, 956 F.3d 1351, 1355 (Fed. Cir. 2020) (citing *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149 (Fed. Cir. 2019)). "Judgment on the pleadings shall only be granted if the moving party clearly establishes that there are no material issues of fact and that the moving party is entitled to judgment as a matter of law." *Intl. Bus. Machines Corp. v. Zynga Inc.*, No. CV 22-590-GBW, 2024 WL 3967402, at *2 (D. Del. Aug. 28, 2024) (citing *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 220 (3d Cir. 2005)). "In reviewing a [Rule] 12(c) motion, the court must view the facts in the pleadings and the inferences drawn therefrom in the light most favorable to the non-moving party." *Rosenau v. Unifund Corp.*, 539 F.3d 218, 221 (3d Cir.2008) (citing *Jablonski v. Pan Am. World Airways, Inc.*, 863 F.2d 289, 290–91 (3d Cir.1988)). Courts utilize the same standards for motions for judgments on the pleadings pursuant to Rule 12(c) as they do for a motion to dismiss pursuant to Rule 12(b)(6). *See Spruill v. Gillis*, 372 F.3d 218, 223 n.2 (3d Cir. 2004) ("There is no material difference in the applicable legal standards.").

### b. Patent Eligible Subject Matter

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Section 101 of the Patent Act defines patent-eligible subject matter. It states, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has

8

held that there are exceptions to § 101. "Laws of nature, natural phenomena, and abstract ideas are not patentable." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks and citation omitted). "[I]n applying the § 101 exception, [the Court] must distinguish between patents that claim the 'building blocks' of human ingenuity and those that integrate the building blocks into something more[] thereby 'transforming' them into a patent-eligible invention. The former 'would risk disproportionately tying up the use of the underlying' ideas and are therefore ineligible for patent protection. The latter pose no comparable risk of pre-emption, and therefore remain eligible for the monopoly granted under our patent laws." *Id.* at 217 (cleaned up).

The Supreme Court's *Alice* decision established a two-step framework for determining patent-eligibility under § 101. In the first step, the Court must determine whether the claims at issue are directed to a patent ineligible concept. *Id.* In other words, the Court asks whether the claims are directed to a law of nature, natural phenomenon, or abstract idea. *Id.* If the answer to the question is "no," then the patent is not invalid for teaching ineligible subject matter under § 101. If the answer to the question is "yes," then the Court proceeds to step two, where it considers "the elements of each claim both individually and as an ordered combination" to determine if there is an "inventive concept—i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18 (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221 (internal quotation marks and citation omitted). Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id.* at 222 (quoting *Bilski*, 561 U.S. at

9

610–11). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 223.

### III. DISCUSSION

GE claims that the Claims of the '080 Patent and '924 Patent fail both steps of the *Alice* inquiry. D.I. 81 at 9. First, GE asserts that the Claims are "directed to the abstract idea of collecting data (sensed fuel or combustion characteristic), analyzing the data (comparing the collected data to a predetermined range), and using the comparison either to take an appropriate action (adding an additive to the fuel if outside the range) or to take no action. *Id.* Second, GE asserts that nothing in the Claims adds an "inventive concept" beyond the abstract idea itself. *Id.* Thus, GE contends that these Claims are the type directed to collecting, analyzing, and using data that the Federal Circuit has consistently found ineligible. *Id.*

The Court agrees. Because the Claims are directed to the abstract idea of collecting, analyzing, and using data and does not add an inventive concept, the Claims fail the *Alice* test and cover patent-ineligible subject matter.

#### a. Alice Step One: The Claims Are Directed to an Abstract Idea

The Claims fail *Alice* step one because they are directed towards an abstract idea. In its motion, GE asserts that the '080 Patent and '924 Patent fail *Alice* step one because they claim an abstract idea: collecting, analyzing, and using data. D.I. 81 at 9. In support of its argument, GE cites to *Parker v. Flook*, 437 U.S. 584, 586-87 (1978), where the Supreme Court found patent claims ineligible. The claims in *Parker* consisted of "three steps: an initial step which merely measures the present value of [a] process variable (e.g., the temperature); an intermediate step which uses an algorithm to calculate an updated alarm-limit value; and a final step in which the actual alarm limit is adjusted to the updated value." *Id.* at 585. The Court in *Parker* found the

10

claims ineligible because the patent did not claim "how to select . . . any of the variables," did not "contain any disclosure relating to the chemical processes at work, the monitoring process variables, or the means of setting off an alarm or adjusting an alarm. *Id.* at 586-87.

GE also asserts that the Federal Circuit has specifically held that collecting, analyzing, and using data in a feedback control system is an abstract idea. D.I. 81 at 10. For example, GE cites to *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016) and summarizes the claims in the patent in dispute in that case as follows: they contained several steps including "receiving data" from a plurality of data streams, "detecting and analyzing events" from the data streams, "displaying" information including "the event analysis results and diagnoses of events," "accumulating and updating the measurements from the data streams," and "deriving a composite indicator of reliability that is an indicator of power grid vulnerability." *Id.*

The Federal Circuit in *Electric Power Group* found the patent invalid under Section 101 because (1) "collecting information, including when limited to particular content (which does not change its character as information), [is] within the realm of abstract ideas"; (2) "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, [is] essentially [a] mental process[] within the abstract-idea category"; and (3) "merely presenting the results of abstract processes . . . is abstract as an ancillary part of such collection and analysis." *Id.* at 1353–54. The Federal Circuit also cited *Parker* for the proposition that "analyzing information by steps people go through in their minds, or by mathematical algorithms, without more, [are] essentially mental processes within the abstract-idea category." *Id.*

In response, LPP contends that the Claims in the patents in dispute in this action satisfy *Alice* step one because not all "uses of feedback data are abstract." D.I. 91 at 5. Instead, LPP claims that "feedback systems are abstract if they are merely used for data manipulation (e.g.,

11

displaying data, creating reports, etc.) or for human decision making." *Id.* LPP reaches this conclusion by distinguishing GE's cited cases above. First, LPP distinguishes the claims at issue in *Parker* from the Claims in this case because, in LPP's view, the *Parker* claimed method did not even claim to actually adjust the alarm limit but merely provided "a formula for computing an updated alarm limit." D.I. 91 at 7 (citing *Parker*, 437 U.S. at 595 (1978)). Second, LPP highlights language from *Electric Power Group* where the Federal Circuit found the claim abstract because they were "merely presenting the results of collecting and analyzing information." D.I. 91 at 6. (emphasis removed) (citing *Electric Power Group*, 8302 F.3d at 1354).

With respect to the patents in dispute in this action, however, LPP contends that the Claims are directed to feedback systems that are different than the data manipulation and mental process examples that GE cites. D.I. 91 at 8. LPP asserts that the Claims are directed to systems and methods for "fuel feed adjustment" for use with a combustion device that actually adjusts the fuel feed by "sensing a sensed fuel characteristic," "comparing the sensed fuel characteristic to an acceptable range," and "feeding an additive to the fuel feed" based on feedback from the sensor and processor. *Id.* (emphasis omitted) (citing claims 1, 19, 20 of the '080 Patent). LPP contends that, where feedback data is used to modify the physical operation of a system, courts routinely find such claims patent-eligible. *Id.*

However, LPP's argument fails because the Claims do nothing more than create a feedback system. As stated in GE's reply brief, the Claims of the Patents "require, at most (if at all), a one-time addition of an additive in some unspecified amount." D.I. 93 at 4. In fact, the Claims are contrary to LPP's assertion that the claimed method includes a "dynamic adjustment of fuel characteristics." *Id.* (internal quotations omitted) (quoting D.I. 91 at 1). Importantly, the Claims

12

do not provide any guidance on how the predetermined acceptable range should be set nor require that the additive cause combustion to occur within the predetermined acceptable range.

Also, the Claims in the Patents in dispute are not unlike the claims in the cases that LPP attempts to distinguish. In *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, the court found the claims directed to "gathering and monitoring blending data and using it to generate reports with a computer" to be abstract. No. CV 17-1390-LPS-CJB, 2020 WL 362789, at *3-4 (D. Del. Jan. 22, 2020), report and recommendation adopted, No. CV 17-1390-LPS-CJB, 2020 WL 1527321 (D. Del. Mar. 31, 2020). Although LPP tries to differentiate the *Sunoco* claims (which merely generated a report) from the Claims in the Patents in dispute in this action (which physically adjust the system based on feedback), *see* D.I. 91 at 10, the distinction does not hold up.

In *Sunoco*, claim 30 of the patent-in-suit actually provided for a "processor [that] uses the butane blend rate to control an injector that regulates the flow of butane." *Sunoco Partners Mktg.*, 2020 WL 362789, at *6. Also, claim 30 was directed toward a physical system and did not just generate a report. Nonetheless, the court in *Sunoco* found the claim abstract because it provided no details regarding the "injector," or how it "regulates the flow of butane," or how it is "control[led]" by the processor. *Id.* As the Court explained:

> It is not dispositive that the claim makes reference to a physical, tangible item that is something other than a computer component (here, an "injector"). What matters is that the "injector" is described generically in the specification in a way that provides no indication that it (either standing alone, or in combination with other elements in this claim) is the key focus or basic thrust of the claim.

*Id.*

The Claims in the Patents in dispute in this action have the same issue. While the Claims reference a physical, tangible system, they are too generic to be anything but abstract. For example, Claim 1 of the '080 Patent explains that the claim is directed to a "fuel feed adjustment system for use with a combustion device (e.g., low-emission gas turbine) having a fuel feed." '080 Patent, col., 7:34-35. Claim 1 goes on to list a sensor, a processor, and an additive feed. D.I. 91 at 13. But claim 1 provides no guidance on how to set a predetermined range or how the additive causes combustion to occur within the predetermined acceptable range. *See, e.g., Free Stream Media Corp. v. Alphonso Inc.*, 996 F.3d 1355, 1358–59, 1361–62 (Fed. Cir. 2021) (finding ineligible subject matter because the claim phrase "processor configured to" was insufficient to describe how the asserted claim achieved their intended result).

The remaining cases cited by LPP are also distinguished from the facts of this case. First, LPP makes no claim that this method is an "improvement over conventional methods." *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, 624 F. Supp. 3d 484, 491 (D. Del. 2022) (finding claims patent eligible because they are a specific improvement over previous systems). Second, in this action, GE has properly articulated the bases for patent ineligibility in its motion. *Cf. Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17- 1390-LPS-CJB, 2019 WL 4466766, at *5 (D. Del. Sept. 18, 2019) (denying defendant's motion without prejudice because the defendants "fail[ed] to properly articulate an asserted abstract idea that the claims are directed to."); *Carrum Technologies, LLC v. BMW of North America, LLC*, C.A. No. 18-1645-RGA, 2019 WL 1779863 (D. Del. Apr. 23, 2019) (rejecting the defendants' characterization of the claims as directed to "no more than a mental process").

Further, the dependent claims also show that the asserted invention is directed to an abstract idea. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1369 (Fed. Cir. 2020) (examining if

14

the dependent claims are directed to patent-eligible subject matter by "further specify[ing] the physical features or operation of the device"). LPP refers to a few dependent claims that it claims indicate how the asserted invention will use the claimed sensor. For example, claim 2 recites that the "sensor" of claim 1 senses a fuel characteristic by using several methods such as "infrared absorption spectroscopy, (FTIR); Raman spectroscopy; gas chromatography" and others. D.I. 91 at 14. However, all dependent claim 2 does is simply identify several conventional sensing techniques without providing any guidance that would make the alleged invention not abstract. Indeed, none of the dependent claims that LPP highlights—2, 4, 8-10, 12-14, 16—provide any additional guidance. As a result, these dependent claims are like the independent claim and are directed towards an abstract idea.

### b. Alice Step Two: The Claims Lack an Inventive Concept

The Claims[1] fail *Alice* step two because they lack an inventive concept. LPP claims there is an inventive concept because of the arrangement of the content of the Claims. D.I. 91 at 16. According to LPP, "[t]he inventive concept is evident not only in the claims but also in the specification, which describes the unconventional nature of the arrangement of the claimed features, and its benefits." *Id.* For example, LPP states that the "specification describes how the particular arrangement of claimed elements is a technical improvement in combustion devices performance, allowing them to adjust to variations in fuel feed and combustions characteristics." *Id.* However, this conclusory statement does not make it so, and LPP provides no evidence of a technical improvement nor any citation within the specification that indicates such an

---

[1] As stated *supra* Section I, claims 1, 2, 4, 8-10, 12–14, 16, 19, and 20 of the '080 Patent and claims 1–6, 8, 9, 11, 12, 16, 17 and 19 of the '924 Patent.

improvement. This lack of evidence also negates LPP's argument that the "inventive concept is evident in the Claims." *Id.* at 18

Finally, LPP cites *Bascom Glob. Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016), in its defense. In *Bascom*, the Federal Circuit found an inventive concept in claims directed at an abstract idea. *Id.* at 1350. Importantly, in *Bascom*, even though the abstract idea of "[f]iltering content on the internet was already a known concept," the claims recited a "specific, discrete implementation of the abstract idea." *Id.* LPP attempts to rely on *Bascom* to assert that, because the Claims and specification of the patents-in-suit in this action recite a specific implementation of fuel feed adjustment systems and methods for a combustion device, there is an inventive concept. However, LPP ignores the rest of the language from *Bascom* which makes it clear that "the patent describes how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." *Id.* That is not the case with the claims of the '080 Patent and the '924 Patent. Thus, LPP's argument that the claims of the '080 Patent and the '924 Patent contain an inventive concept lacks merit and fails.

## IV. CONCLUSION

The Court finds that claims 1, 2, 4, 8-10, 12–14, 16, 19, and 20 of the '080 Patent and claims 1–6, 8, 9, 11, 12, 16, 17 and 19 of the '924 Patent are not directed to patent-eligible subject matter. Thus, GE's Motion for Judgment on the Pleadings (D.I. 80) is GRANTED. An accompanying Order will be entered.